The spirit of the act must be respected, and the statute so construed as to promote in the fullest manner the policy and object of the legislature.   *U. S.* v. *Winn*, 3 Sum. 209; *The Enterprise*, 1 Paine, 32; *Dorousseau* v. *U. S.*, 6 Cranch, 314, 323.   The applicant clearly came within the purview of the law as to existing licenses, and had a proprietary interest which the legislature intended should be protected.   The prohibition in the act had no application to a person so situated, and he is entitled to an order commanding the board to issue a license upon payment of the proper fee.

## Johns v. Press Pub. Co.

*(Superior Court of New York City, General Term.   May 2, 1892.)*

LIBEL—PRIVILEGED PUBLICATION—FAIR REPORT OF TRIAL—COMMENT.

A newspaper, after publishing a fair report of the pleadings and evidence in a suit wherein defendant was charged with misappropriation of moneys intrusted to him to invest, stated that defendant was well known in the city, and lived in a particular quarter, where his wife had recently purchased an elegant house, and that he was a very active member of the church, and prominent in social circles in the quarter where he lived.   *Held* that, the report and comments being true, and no malice shown, plaintiff was properly nonsuited in an action for libel founded on the report.

Appeal from trial term.

Action by George C. Johns against the Press Publishing Company for libel. From a judgment for defendant, plaintiff appeals.   Reversed.

For former report, see 8 N. Y. Supp. 958, *mem.*

The alleged libel was a newspaper publication as follows:

"Here is another ewe lamb.  Mrs. Blackwell seeks balm and Broker Johns' scalp.  She goes to the courts for both.  Her $6,000 and faith in a ' nice young man ' disappeared simultaneously, she says.  Johns says he lost the money speculating under the lady's direction.  A very interesting suit was begun yesterday before Judge FREEDMAN in superior court, part IV.  The parties to the suit are Mrs. Emily Blackwell, a modest little body, who is suing to have some sort of a contract set aside, so that she may bring a criminal action against ex-Broker George C. Johns, now general manager of the Erie Iron Works, No. 9 Dey street.  Mrs. Blackwell's home is in Brooklyn.  Her husband is Dr. Robert Blackwell, a well-known operator in Wall street.  In her complaint Mrs. Blackwell alleges that in 1881 she wished to invest $6,000 pin money saved from sums allowed her by her husband, and advised with her friend, Miss Sarah Cowen, who lived in One Hundred and Twenty-Fourth street, but who is now dead.  Mrs. Blackwell wanted to invest in government bonds or good securities.  ' Only,' said the shrinking little lady, ' I am so afraid of going into that dreadful street among bulls and bears.'  She did not consult her husband, because he was to be kept in ignorance of the whole affair.  ' Oh, if that is the case, you should meet Mr. George Johns,' replied Miss Cowen.  'He is a real nice broker.  He lives in my house.  I'll introduce you.'  Later, according to Mrs. Blackwell's story, she met Mr. Johns, and he was ' real nice.'  Certainly he would do anything he could to oblige her. Command him.  But was it not a mistake to go in for government bonds? Would it not be better to buy some of the active stock on the market, say Canada Southern?  Well, some Canada Southern was bought, and an agreement was entered into verbally that Mr. Johns was to buy and sell for Mrs. Blackwell, always, however, under her direction, and with her consent. Several investments were made, and finally, at the end of two years, Mrs. Blackwell says she awakened to the fact that Johns had speculated with her property, and on one occasion had secured three bonds from her friend, Miss Cowen, by a misrepresentation.  Another year rolled by, and Mrs. Blackwell became clamorous for her money.  She asked Mr. Johns for a statement of his transactions.  Mr. Johns was, his letter said, too busy just then.  Then Mrs.

Blackwell became imperious. She wrote Mr. Johns that she would prosecute him criminally if he did not make a statement, and pay her what she had given him. Then, she says, he confessed that he had lost every cent she had intrusted to his care. His wife, Mrs. Blackwell says, pleaded for him, and he promised to do his best to recover the loss if she would give him a chance. To this end he proposed that she meet him at the office of his attorneys, Smith & Bowman. She did so, and a most peculiar agreement was executed, whereby Mrs. Blackwell bound herself never to prosecute Johns criminally, and whereby Johns agreed that he would pay her a monthly stipend of $25 so long as his salary was $1,500 a year, nothing at all if less, and a greater proportionate amount as his salary increased, until the $6,000 was made good. This was the figure he claimed to be receiving. He further stipulated that, in the event of the death of both her father and her mother, he would be released from all other obligations. The agreement states that this was merely a matter of charity on his part,—pure charity. In all he paid her, she says, $1,110, and then ceased. Mrs. Blackwell threatened him, but she avers he laughed at her, and said: 'Why, I don't have to pay you anything. That agreement is not legal.' Finding that Johns would do nothing more, Mrs. Blackwell went to ex-Judge Henry W. Leonard and told her story. He has undertaken to have the court set aside the agreement signed by Mrs. Blackwell, so that she may sue Johns for the balance of the sum due her or prosecute him criminally. Mr. Johns denies all the allegations made by Mrs. Blackwell, and says that he only got $5,000 from her, and that he lost it speculating in the street under her direction. Lawyer H. C. Claus is conducting his defense. Mr. Johns is well known among the machinery men of the city, and lives at Mount Vernon, where his wife has recently purchased an elegant home. He is a very active member of the church, and prominent in Mount Vernon social circles."

The opinion of McAdam, J., at trial term, was as follows:

"Aside from ex parte petitions and the like, any publication made in the ordinary course of judicial proceedings is privileged if the article be a fair and impartial account thereof. Though the publication may be to the disadvantage of the particular suitor, the paramount advantage to the public fully justifies the end attained. Perhaps the earliest and best expression of the reason of the rule is that contained in the opinion of Lawrence, J., in Rex v. Wright, 8 Term R. 298, in which it is stated, in substance, that, though the publication of proceedings in courts of justice may severely reflect on individuals, yet such publications, if they contain true accounts, are not libels, not the subjects of actions, because it is of great importance that the proceedings of courts of justice shall be known; that the general advantage to the country in having these proceedings made public more than counterbalances the inconvenience to the person whose conduct may be the subject of the proceedings; or, as Pollock, C. B., said in Ryalls v. Leader, L. R. 1 Exch. 299: 'One ought to make as wide as possible the right of the public to know what takes place in any court of justice, and to protect a fair bona fide statement of proceedings there.' There was a judicial hearing and inquiry had in the present case in open court, and the public had the right to know all about it. The policy of the state is tersely expressed in these words: 'Every citizen may freely speak, write, and publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press.' Const. art. 1, § 8. This is the supreme law of the land, and contains as noble a sentiment as was ever penned by man. The truth, irrespective of motives, is a complete justification to a civil action for libel. In criminal prosecutions the accused is obliged to go a step further, and prove that the publication was made with good motives, and for justifiable ends. Id. This is to prevent breaches of the public peace. Nor is a defendant, by pleading the truth in

justification, although the plea be unsustained by proof at the trial, entitled to have that circumstance considered by the jury as evidence or malice, or to enchance the damages, (*Klinck* v. *Colby*, 46 N. Y. 427) unless it be interposed in bad faith, (*Holmes* v. *Jones*, 121 N. Y. 461, 24 N. E. Rep. 701,) and the circumstances warrant that conclusion. Every one has a right to comment on matters of public interest and general concern, provided he does so fairly, and with an honest purpose. Such comments are not libelous, however severe in their terms, unless they are written maliciously. While the law justifies honest reports and comments, it will not permit one, under the guise of reporting proceedings, to use the dagger of malice, the assassin of character, to circulate falsehood, whose only office is to injure and destroy. Report and comment are two separate and distinct things. A report is the mechanical reproduction of what actually took place. Comment is the judgment passed on the circumstances reported, by one who has applied his mind to them. Fair reports are privileged, while fair comments are no libels at all. Blending the reports and comment together does not make the article libelous if it would not be such if the one were separated from the other. A careful reading of the article complained of, in connection with the pleadings in the action commented upon, in the light of the evidence given by the plaintiff on this trial, proves that the article is a fair report, and that the comments are substantially true. The report is, therefore, within the protection of privileged publications, and the comments are fully justified by the facts disclosed. The comments, being true, are not libelous, and, the report being privileged, the plaintiff could only recover upon affirmative proof of malice, and there is an entire absence of that essential element in this case. Where the publication is not privileged, a different rule prevails, and malice may be implied from the mere falsity of the charge, but where the communication is privileged it rebuts the *prima facie* inference of malice, and throws upon the plaintiff the burden of proving malice in fact. Reference to the language of the article, and to the facts in the pleading and evidence confirming its accuracy, has been intentionally omitted, as it might prove as offensive to the plaintiff as the article itself; perhaps more so. There has been a tendency in some cases to limit the power of the court to the decision of the question whether the article complained of is privileged, and requiring the submission to the jury of the question whether the defendant fairly and properly conducted himself in the exercise of it; but the evidence in this case so clearly shows the absence of misconduct that the action admits of only one result, and that a verdict for the defendant. The English cases hold that it is only when the judge is satisfied that the publication cannot be a libel, and that, if it is found by the jury to be such, their verdict will be set aside, that he is justified in withdrawing the question from their cognizance. Per KELLY, C. B., *Cox* v. *Lee*, L. R. 4 Exch. 288; *Hart* v. *Wall*, 2 C. P. Div. 146. The article here complained of is not susceptible of a double meaning, one innocent, and the other libelous; and the action does not fall within the rule requiring the jury to determine whether the article is libelous or not. The rule applicable is that where, upon the whole evidence, a verdict in favor of a plaintiff would be set aside as against evidence, it is the duty of the court to grant a nonsuit. *Neuendorff* v. *World M. L. I. Co.*, 69 N. Y., at page 393. This is such a case. No injustice was done to the plaintiff, his complaint was properly dismissed, and the motion for a new trial must be denied."

Argued before SEDGWICK, C. J., and DUGRO and GILDERSLEEVE, JJ.

*Smith, Bowman & Close*, for appellant. *Lowrey, Stone & Auerbach*, for respondent.

PER CURIAM. Judgment and order affirmed upon the opinion of the learned trial judge.